**Ann ALLWORTH, Appellant,**

v.

**HOWARD UNIVERSITY, Appellee.**

**No. 05–CV–24.**

District of Columbia Court of Appeals.

Argued Dec. 14, 2005.

Decided Jan. 12, 2006.

---

S. Micah Salb, with whom Richard H. Semsker was on the brief, Bethesda MD, for appellant.

Daniel I. Prywes, with whom Stephen S. Kaye was on the brief, Washington, for appellee.

Before FARRELL and REID, Associate Judges, and MORIN,* Associate Judge, Superior Court of the District of Columbia.

REID, Associate Judge:

This case involves appellant Ann Allworth's challenge to Howard University's ("Howard") denial of her application for tenure in the Department of Anatomy, College of Medicine. The trial court granted Howard's motion for summary judgment and dismissed Dr. Allworth's complaint. Dr. Allworth contends that summary judgment was improper because there are material issues in dispute, and Howard breached its duty of good faith and fair dealing by interfering with her ability to conduct research. We affirm, holding that Howard was entitled to judgment as a matter of law.

## FACTUAL SUMMARY

The record before us establishes that the Dean of the Howard University College of Medicine offered Dr. Allworth a tenure track appointment as an Assistant Professor of Anatomy on June 21, 1995.[1] Approximately five years later, Dr. Allworth filed her application for tenure and promotion to the rank of Associate Professor. On November 14, 2000, the Chairman of the Department of Anatomy sent a written memorandum to the College of Medicine Appointment and Promotions Committee indicating that the Appointments, Promotion, and Tenure Committee of the Department of Anatomy had met for three hours to assess Dr. Allworth's application. The Department of Anatomy's Committee voted 7–6 against tenure and promotion; it "considered Dr. Allworth's research productivity weak." A few weeks later, on December 4, 2000, a scholarly journal, MOLECULAR REPRODUCTION AND DEVELOPMENT, informed Dr. Allworth that the paper she had authored with three other persons ("Temporal Relationship of Nuclear Structure and Transcription in Mouse Oocytes and Preimplantation Embryos") had been rejected for publication. The cover letter referenced "serious criticisms" of the paper by reviewers, attached the comments of the reviewers, and left open the possibility of a new submission.

On February 12, 2001, the Vice Provost for Health Affairs and Dean of the College of Medicine[2] sent a letter to the Chairman of the Department of Anatomy informing him that the College-wide Committee on Faculty Appointments, Promotions, and

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. Tenure track positions at Howard usually are multi-year probationary appointments which generally result in an application for tenure toward the end of the probationary period.

2. Also referred to sometimes only as the "Dean of the College of Medicine."

Tenure regarded Dr. Allworth's application as "premature" and concluded that Dr. Allworth "should be given another year to improve her scholarly productivity." [3] Subsequently, on June 18, 2001, the Dean of the College of Medicine sent a letter to the Interim Provost "requesting that Dr. Allworth be given an additional two years on the tenure track to meet the rigorous criteria for tenure and to re-apply for tenure during the fiscal year 2004 promotion cycle." The letter also asked that Dr. Allworth be promoted to the rank of Associate Professor. On July 16, 2001, the Provost and Chief Academic Officer responded, stating that "effective August 3, 2001, [Dr. Allworth] will have completed seven years in probationary status," and hence, an additional two-year extension was not possible under the Faculty Handbook. The Provost and Chief Academic Officer also declined to support the recommendation of a promotion to Associate Professor.

Dr. Allworth requested reconsideration of her tenure application on October 18, 2001, and the Chair of the departmental appointments, promotion and tenure committee sent a letter to Dr. Allworth on November 9, 2001, advising her that the committee did not recommend her promotion with tenure due to "the lack of progress in [her] publication record of peer-reviewed papers...," although it "continues to be pleased with your excellent and improving record in teaching and service." In a letter dated February 19, 2002, the Vice Provost for Health Affairs and Dean of the College of Medicine informed the Chairman of the Department of Anatomy of the following assessment of Dr. Allworth and recommendation by the College-wide Committee on Faculty Appointments, Promotions, and Tenure, with which he did not concur:

> The Committee found that Dr. Allworth has made an outstanding contribution to the College of Medicine's teaching program and currently serves in the very laborious and time consuming position of block coordinator of the Structure and Function course. Dr. Allworth has further made significant service contributions to the University and the community at large, and has been successful in receiving two substantial grants for her breast cancer research. The Committee found that Dr. Allworth's publication record is deficient, having produced only a single junior authored publication in her 6 years at Howard. The Committee recognized Dr. Allworth's problems with contamination of her tissue cultures, but could not support her request for promotion given her low scholarly productivity.

Around one month later, Dr. Allworth forwarded a detailed letter to the Vice President of Health Affairs and Dean of the College of Medicine summarizing the obstacles she encountered in her research endeavors, including the lack of a laboratory upon arrival, the necessity of changing her research focus from developmental cell biology to cancer because of the lab assigned to her in the Cancer Center in November of 1996, the forced move to a different laboratory in the Cancer Center in early 1997, the contamination of the shared tissue culture facility which she used, and the lack of an operational "free standing hood" for her laboratory until January 31, 2002. She also explained that she accepted the Structure and Function block coordinator position with the understanding that she would have two addi-

---

**3.** The 2000–2001 Annual Report of the Department of Anatomy listed no publications for Dr. Allworth, but did reference two funded three-year research grants in her name, one for $151,196 and the other for $266,939.

tional years in which to meet the tenure publication requirement, and she listed her accomplishments, including four teaching awards in a six-year period, improvements in the curriculum, and development of an interactive web page for the Structure and Function Block.

On May 2, 2002, the Chairman of the Department of Anatomy recommended Dr. Allworth "for a two year, full time, tenure track position as an Assistant Professor in the Department of Anatomy . . ., a two year extension of her probationary period." On November 6, 2003, the Appointment, Promotion, and Tenure Committee of the Department of Anatomy voted 9–2 against the promotion and tenure of Dr. Allworth. The Chairman of the Department of Anatomy informed Dr. Allworth, by letter of November 19, 2003, that the College had turned down her request for promotion to the rank of Associate Professor. He indicated that he "could not support [her] application for promotion without research publications and viable evidence of possible future research productivity." The Chairman reiterated his position in a letter of December 9, 2003, to the Promotions and Tenure Committee of the College of Medicine. Later, on December 23, 2003, the Appointments, Promotions and Tenure Committee of the Department of Anatomy confirmed its November 2003 decision to deny promotion and tenure to Dr. Allworth.

The College-wide Committee on Faculty Appointments, Promotions and Tenure recommended that Dr. Allworth not be promoted due to a lack of progress in the areas of "scholarly activities and grantsmanship." And, in a letter dated March 31, 2004, the Dean of the College of Medicine recounted the delay in Dr. Allworth's research progess "[b]ecause of a change in research focus and acquisition of equip-

ment to pursue her investigations." He concluded:

> During her probationary period, Dr. Allworth did not demonstrate adequate scholarly productivity to warrant promotion and tenure. In this regard, I support the recommendations of the Chairman and the two [appointments, promotions, and tenure] committees. Dr. Allworth is recognized as a dedicated and energetic teacher, who receives high praise from students and colleagues alike and is the recipient of teaching awards. Dr. Allworth is a member of several college committees. She mentors students and initiated and coordinates the college's Cadaver Memorial Service Program.
>
> While Dr. Allworth has demonstrated teaching and mentoring skills, I cannot recommend Dr. Allworth for promotion because of deficiency in scholarly productivity.

Dr. Allworth filed a complaint against Howard University on November 7, 2003, in the Superior Court of the District of Columbia, alleging breach of contract[4] and breach of the covenant of good faith and fair dealing. With respect to the latter claim she maintains, in part that:

> [Howard] refused to promote [her] to the rank of Associate Professor with tenure because she had not conducted sufficient research. However, it was [Howard] which created the situation whereby [Dr. Allworth] was unable to conduct research. Therefore, to the extent that completing a certain amount of research is a requirement of the contract, [Howard's] inaction caused [her] to be unable to perform under the contract. As a result of [Howard's] failure to maintain a sterile and uncontaminated tissue culture facility, [Howard] has

---

4. She does not pursue this claim on appeal.

breached its covenant with [Dr. Allworth] of good faith and fair dealing.

The parties filed cross-motions for summary judgment following discovery and depositions. The trial court granted Howard's motion for summary judgment. In doing so, the court declared the following concerning Dr. Allworth's breach of the covenant of good faith and fair dealing claim:

> The more significant question raised in Dr. Allworth's complaint . . . is whether the University afforded her a fair chance to obtain tenure. When Dr. Allworth was hired[,] her background was in the field of developmental cell biology. After joining the University she was assigned research space in the Cancer Center. This lab assignment caused her to change her research to cancer research; thus, she began her focus on breast cancer cells. She was successful in obtaining a grant to fund her research, but before she was able to submit acceptable articles for publication, she encountered substantial problems in the laboratory stemming from cell contamination. The University initiated steps to correct the problems so that the scientists who used the Cancer Research Lab, including Dr. Allworth, could proceed with their work. Without doubt, Dr. Allworth lost valuable time, however, she and the University disagree over the extent to which the problem in the lab contributed to her inability to perform her research. Dr. Allworth's response to the problems in the laboratory was to divert her attention from research and to emphasize teaching, administration, and committee work. Her endeavors were quite beneficial to the University, were noted in her tenure application, and were recognized by the reviewing authorities. Unfortunately, this work did not provide a substitute for the requirement of publishing. Indeed, the record shows that a number of Dr. Allworth's colleagues wrote to the curriculum committee requesting that her, "co-block leadership in structure and function [be] reassigned" so that she could focus on her research.

> . . . . Dr. Allworth argues that for significant periods of time the University did not provide laboratory space in which she could perform her research, denied her sufficient funding, and gave her responsibilities as Block Head that consumed a great deal of time, then, denied her tenure. While there is some evidence to support these arguments, it cannot defeat a grant of summary judgment because she cannot show that any of these occurrences, singly or collectively, prevented her from taking the initiative to continue her research and to get it published in the nine years that she worked on a tenure track.

Ultimately, the court concluded that the University followed the tenure standards set forth in its Faculty Handbook, which in large measure serves as the contract of employment for Howard faculty:[5]

> In any event, Dr. Allworth's contract with the University did not guarantee that she would be awarded tenure— merely that she would be eligible for tenure. As the court said in *Paul [v. Howard Univ.,* 754 A.2d 297 (D.C.

5. Section 2.1 of the Howard University Faculty Handbook for 1993 provides, in pertinent part:

Contractual Force of Handbook.

Sections 2 and 3 of this handbook contains the approved policies and procedures of Howard University concerning the terms and conditions of the faculty of the university. These sections are incorporated into the individual contract of employment of each faculty member . . . .

2000) ], "The record shows that she had no contractual right to receive tenure automatically and that [the University] acted within the standards set forth in the handbooks when considering her tenure applications." *Paul, supra,* at 311. Like Dr. Paul, Dr. Allworth cannot prove her claim[ ] of ... breach of the covenant of good faith and fair dealing. Therefore, the court must grant the University's motion for summary judgment.

Dr. Allworth filed a timely appeal.

## ANALYSIS

In essence, Dr. Allworth first contends that there are genuine material facts in dispute, and that the trial court "adopted an inference which is not only unwarranted by the facts but also reflects the sort of weighing of the evidence which is outside the authority of the trial judge in a summary judgment proceeding." Specifically, she faults the trial court for stating that "she cannot show that any of these occurrences [i.e., lack of laboratory space, insufficient funding, and responsibilities as Block Head], singly or collectively, prevented her from taking the initiative to continue her research and to get it published in the nine years that she worked on a tenure track." She maintains that "[t]he parties have not agreed that [she] could have taken the initiative." Her related contention concerning her breach of the covenant of good faith and fair dealing claim, in many respects, parallels her argument regarding the alleged material facts in dispute. She asserts that "Howard University was the cause of [her] inability to perform [her] contractual obligation [to produce sufficient research publications]," and "demonstrate[d] a gross lack of diligence ... in meeting its contractual obligation to provide sufficient laboratory space for [her]."

Howard emphasizes the reluctance of courts to "second-guess discretionary [university] decisions involving tenure." It insists that there was no violation of the covenant of good faith and fair dealing because it made a rational decision in denying tenure to Dr. Allworth, and in doing so, took into consideration the "extenuating circumstances" of Dr. Allworth's situation by giving her additional time in which to seek tenure.

We " 'review a grant or denial of a motion for summary judgment *de novo* to determine whether any genuine issue of material fact exists and whether the prevailing party was entitled to judgment as a matter of law.' " *Columbia Plaza Tenants' Ass'n v. Columbia Plaza Ltd. P'ship,* 869 A.2d 329, 332 (D.C.2005) (quoting *Evans v. Medical Inter–Insurance Exch.,* 856 A.2d 609, 612 (D.C.2004) (citing *Herbin v. Hoeffel,* 806 A.2d 186, 190 (D.C.2002) (other citation omitted))). We review the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of that party. *Id.* " 'We will affirm the entry of summary judgment if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting *Kelley v. Broadmoor Co-op. Apartments,* 676 A.2d 453, 456 (D.C.1996) (citations and internal quotation marks omitted)).

We begin with the tenure standards set forth in the Faculty Handbook. Although Dr. Allworth "does not concede" in her brief "that achieving a certain level of research publications is a contractual requirement for tenure under the Faculty Handbook," she "accepts" this proposition "for purposes of her claim for Breach of the Covenant of Good Faith and Fair Dealing." In fact, the plain words of section 2.7.4 of the Faculty Handbook, which deals with tenure, contain several references to

research and publications. Section 2.7.4.1(a) provides in relevant part:

> The existence of a system of tenure is justified in that it ensures the necessary conditions that allow tenured faculty to achieve and maintain superior quality of their performance of the four major functions of universities in the modern world. These functions are
>
> > (a) The discovery and dissemination of new knowledge.

Under § 2.7.4.4, the "basic criteria" for tenure include "research and other scholarly achievements." And, §§ 2.7.4.5(c) and (d) specify that among the documents to be assembled for the tenure decision are: "[c]opies of the most relevant publications, indicating if they were peer reviewed," and "[l]etters from reviewers external to the university who are experts in the same discipline as the candidate to provide an evaluation of the quality of the candidate's creative work and its impact on the scholarship of the field."

These sections of the Faculty Handbook reflect the general "publish or perish" standard that is routinely articulated in the academic community. So ingrained is this standard that academics who accept college or university teaching positions generally know that if they are to achieve tenure, they must publish scholarly works.

The case before us is somewhat novel because Dr. Allworth places the blame on the university for her lack of scholarly publications during the almost nine years she spent in the Department of Anatomy of the College of Medicine before being denied promotion and tenure in November/December 2003. As she put it, "Howard University was the cause of [her] inability to perform [her] contractual obligation [to produce sufficient research publications]," and [Howard] "demonstrate[d] a gross lack of diligence ... in meeting its contractual obligation

to provide sufficient laboratory space for [her]." Consequently, she alleges, Howard breached its implied contractual duty of good faith and fair dealing.

■ We briefly addressed the implied contractual duty of good faith and fair dealing in a previous case involving the denial of tenure to a professor in Howard University's Electrical Engineering department. We reiterated our holding that "all contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Paul, supra,* 754 A.2d at 310 (quoting *Hais v. Smith,* 547 A.2d 986, 987 (D.C.1988)). "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Id.* (citing *Hais, supra,* 547 A.2d at 987–88). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *Willens & Niederman v. 2720 Wisconsin Ave. Coop. Ass'n,* 844 A.2d 1126, 1135 (D.C.2004).

■ The RESTATEMENT sheds some light on the meaning of "good faith" in the context of a breach of the covenant of good faith and fair dealing claim:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involv-

ing "bad faith" because they violate standards of decency, fairness or reasonableness.

*Id.* § 205 cmt. a. "Subterfuges and evasions" are not included in examples of good faith; "bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." *Id.* cmt. d. "Bad faith" involves "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* "Bad faith means more than mere negligence...." *Gupta v. New Britain Gen. Hosp.,* 239 Conn. 574, 687 A.2d 111, 122 (1996) (citation and internal quotation marks omitted). We considered the "fair dealing" aspect of a breach of the covenant of good faith and fair dealing claim in *Adler v. Abramson,* 728 A.2d 86 (D.C.1999). There, we determined that "fair dealing" involves reasonable rather than arbitrary or capricious action. *Id.* at 90 (citation omitted); *see Alden v. Georgetown Univ.,* 734 A.2d 1103, 1112 n. 11 (D.C.1999) (student failed to argue that the university's committees' decisions to dismiss him "were based on bad faith or were arbitrary and capricious[,] [thus,] [u]nder these circumstances, Georgetown cannot be found liable for breach of the implied covenant of good faith and fair dealing.").

■ We apply these legal principles in the university context where concepts of academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials. As we reiterated in *Brown v. George Washington Univ.,* 802 A.2d 382 (D.C.2002), " 'courts should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and ten-

ure, especially in institutions of higher learning.' " *Id.* at 385. This is not to say that a court may never examine university promotion and tenure decisions. In that regard, the Supreme Court of Connecticut has declared: "The principle of academic freedom does not preclude [the court] from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract." *Craine v. Trinity Coll.,* 259 Conn. 625, 791 A.2d 518, 540 (2002) (citation omitted). Consequently, where a university or college has adopted tenure and promotion rules or contract provisions, a court may determine whether there has been substantial compliance with those rules. *See Brown, supra,* 802 A.2d at 385 (citing *Loebl v. New York Univ.,* 255 A.D.2d 257, 680 N.Y.S.2d 495, 496–97 (1998)); *Kakaes v. George Washington Univ.,* 790 A.2d 581, 583 (D.C.2002) ("[A]n impartial trier of fact could reasonably find that the University had not complied with the Faculty Code, and that summary judgment was not warranted.") (referencing *Kakaes v. George Washington Univ.,* 683 A.2d 128, 135–36 (D.C.1996)). But in determining whether a university has complied with its own rules or contract, " '[a] court must be careful not to substitute its judgment improperly for the academic judgment of the school.' " *Neiman v. Yale Univ.,* 270 Conn. 244, 851 A.2d 1165, 1172 (2004) (quoting *Craine, supra,* 791 A.2d at 536).

■ In the context of this university promotion and tenure case, we conclude that to create triable issues of fact on her claim of bad faith or unfair dealing, Dr. Allworth had to present evidence not simply of negligence or lack of diligence by the university, but of arbitrary and capricious action on its part. *Adler, supra,* 728 A.2d at 90. Here, the record shows, at most, that Howard was negligent in not providing Dr. Allworth with a contamina-

tion-free laboratory. However, the record also reveals that the university took steps to make other laboratory space available to Dr. Allworth, for example, at the Johns Hopkins University, as it did for other professors whose research was compromised by contamination, and ultimately installed a protective hood in Dr. Allworth's laboratory to control or eliminate the contamination. Despite these efforts on the part of the university, Dr. Allworth's colleagues in the Department of Anatomy, as well as officials in the College of Medicine and the university as a whole, determined that she had not made sufficient progress with respect to scholarly productivity.

■ Moreover, the promotion and tenure process that Howard followed, consistent with its Faculty Handbook, belies Dr. Allworth's contention that the tenure decision was made arbitrarily or capriciously. The Faculty Handbook establishes the criteria for tenure, which include excellence in teaching, research, and other scholarly achievements, as well as contributions to the department, the college and the university. Faculty Handbook, § 2.7.4.4. In addition, § 2.7.4.5 of the Faculty Handbook sets forth the documentation which a professor must assemble for the tenure decision, including copies of the professor's most relevant publications (preferably peer-reviewed publications), letters from external reviewers concerning the quality of the professor's "creative work and its impact on the scholarship of the field." Dr. Allworth does not contend that her department, the College of Medicine, or the University failed to follow the procedures for the tenure recommendation that appear in § 2.7.4.6 of the Faculty Handbook. Rather, she complains that the Howard denied her seven years of unfettered research in a suitable research laboratory, and arbitrarily cancelled her research grant in the project with Johns Hopkins University.

Our review of the record leads us to conclude, as her peers and supervisors realized, that Dr. Allworth loves teaching, devoted substantial time to it, and excelled at teaching. She also made a strong contribution to curriculum revision by serving as a coordinator of the Structure and Function Block. While focusing on these areas, however, Dr. Allworth did not show sufficient productivity in the important areas of research, publication, and grantsmanship. She did not take advantage, as did others, of laboratory facilities at Johns Hopkins University. Nor was she successful in showing progress on the research/publication front as evidenced by the rejection of her paper (authored together with others) in December 2000, by the scholarly journal, MOLECULAR REPRODUCTION AND DEVELOPMENT, and her lack of progress on the Johns Hopkins project which led to the termination of her grant funds. And, she does not dispute the fact—noted by the College-wide Committee on Faculty Appointments, Promotions, and Tenure and reiterated by the Vice Provost for Health and Dean of the College of Medicine on February 19, 2002—that she "produc[ed] only a single junior authored publication in her 6 years at Howard." Consequently, our review of the record satisfies us that Howard was entitled to summary judgment as a matter of law.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*