# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 21, 2009          Decided April 9, 2010

No. 08-7097

CATHERINE GAUJACQ,
APPELLANT

v.

EDF, INC., ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00969)

---

*Carla D. Brown* argued the cause for appellant. With her on the briefs were *Elaine Charlson Bredehoft* and *Kathleen Z. Quill*.

*Laura B. Hoguet* argued the cause for appellees EDF, Inc., et al. With her on the brief was *Dorothea W. Regal*.

*Morgan D. Hodgson* was on the brief for appellee Christian Nadal.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Appellant Catherine Gaujacq filed a complaint in District Court against her former employers, Electricité de France, S.A. ("EDF") and Electricité de France International North America, Inc. ("EDFINA"), claiming violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the District of Columbia Human Rights Act ("DCHRA"), D.C. CODE § 2-1401.01 *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d), and asserting several common law claims. Gaujacq also filed a complaint against Christian Nadal, who succeeded her in the positions that she had held in EDF and EDFINA, alleging that Nadal aided and abetted EDF's discrimination and retaliation in violation of the DCHRA, tortiously interfered with her contractual and business relations, and defamed her. The District Court granted summary judgment in favor of appellees on all counts. *See Gaujacq v. Electricite de France Int'l N. Am., Inc.*, 572 F. Supp. 2d 79, 84 (D.D.C. Aug. 21, 2008).

Appellant does not contest the District Court's awards of summary judgment for the appellees on the tortious interference claim against EDF and the defamation claims against EDF and Nadal. She does, however, seek review of the District Court's summary judgment against her on her remaining Title VII, DCHRA, Equal Pay Act, and common law claims.

We affirm the District Court's summary judgment in favor of EDF on appellant's Title VII and DCHRA gender-based employment discrimination claims, and its summary judgment in favor of Nadal on the related aiding and abetting discrimination claims. The District Court correctly concluded that no reasonable jury could find that the nondiscriminatory business reasons given by EDF to explain company actions relating to appellant's employment were a pretext for gender-based discrimination. We also affirm the District Court's

summary judgment in favor of EDF on appellant's Equal Pay Act claim. The District Court correctly found that any differential in pay between appellant and Nadal was based on factors other than sex. We further affirm the District Court's summary judgment in favor of EDF on appellant's retaliation claim and summary judgment in favor of Nadal on the related aiding and abetting claims. A reasonable jury could not infer from all the evidence that EDF's legitimate, nondiscriminatory business decisions were retaliation against appellant; nor has appellant shown that a disputed negative comment made to her by an EDF official was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Finally, we affirm the District Court's judgments against appellant on all but one of her remaining common law claims. Appellant's complaint asserts a breach of contract claim against EDF due to the employer's alleged failure to reimburse her for certain business expenses. Because the District Court never addressed this issue, we remand the case to allow the trial court to consider the matter in the first instance. Appellant's remaining claims were properly dismissed.

## I. BACKGROUND

### A. *Factual Background*

The facts in this case are amply drawn in the District Court's opinion. *See Gaujacq*, 572 F. Supp. 2d at 83-86. Therefore, we will focus on the salient undisputed, *material* facts, *see* FED. R. CIV. P. 56(c), to amplify our judgment.

Appellee EDF is a French corporation that generates and supplies electricity in France and other countries. Previously a state-owned company, EDF became a private corporation in November 2004 and first sold shares to the public in 2005. EDF's wholly owned subsidiary, EDFINA, functions as EDF's

representative in Washington, D.C. After oral argument in this case, EDFINA merged into EDF Development – now known as EDF Inc. – which remains wholly owned by EDF.

Appellant Catherine Gaujacq was hired by EDF in 1980 after she graduated from engineering school. She continued to work for EDF until she was terminated on January 6, 2005. Gaujacq earned a number of promotions during her tenure with EDF. Her first management position came in 1994, when she became head of operations at a French nuclear plant. Gaujacq was the first woman in France to achieve such a position.

Christian Nadal was hired by EDF as a high-level executive in 1988. Before coming to EDF, Nadal had served for four years as the General Secretary for the French National Coal Board. In addition to holding a number of top management positions at EDF, Nadal served on the company's Executive Committee from 1995 to 1999. From 1999 to 2001, he served as the CEO of EDENOR, an Argentinian energy company in which EDF held an equity interest.

During the time when Gaujacq worked at EDF, the salaries of high-level executives were determined pursuant to a pay grade system. In 2000, EDF adopted the designations R-1 through R-4 (with R-1 as the highest rank) to classify executives under the pay grade system. A number of elements – including "the level of experience of [a] person within the company and outside of the company" – were taken into account to determine whether an executive was classified R-1 under the pay grade system. Dep. of Patrick de Botherel, EDF's Director of Executive Compensation and Benefits, at 45 (Mar. 23, 2006), *reprinted in* 3 Joint Appendix ("J.A.") 1073. Only 50 people out of EDF's more than 160,000 employees held the R-1 rank. Nadal, who was already a senior executive when the R-1 to R-4 ranking system was established, was classified R-1.

Gaujacq was promoted to the senior executive level in 2000 and classified R-3 under the pay grade system. She was appointed to serve as Délégué Général (General Delegate) for the United States and Canada, the company's top North American position, and President and Treasurer of EDFINA. Gaujacq's "substantial experience" in the area of "nuclear energy" made her "well-suited for EDF's goal[s]" in the United States at the time: "to study the U.S. energy developments, reinforce [EDF's] reputation for nuclear expertise within the U.S. energy industry community and position [the company] for possible business involvement in the nuclear area in the United States." Decl. of Yann Laroche, EDF's General Manager of Human Resources in 2003 and 2004 and a member of its Executive Committee, ¶¶ 7-8 (Oct. 12, 2006), *reprinted in* 4 J.A. 1687-88. Gaujacq signed a three-year contract with EDF (the "2000 Expatriate Contract"), with an option to extend for an additional year by mutual consent. As part of her new job assignment, Gaujacq served as EDFINA's representative to NuStart Energy Development, LLC ("NuStart"), a consortium of energy companies working toward developing a nuclear energy plant that could be built within U.S. regulatory constraints.

When Gaujacq assumed her new positions in 2000, it was standard practice for EDF to rotate executives through its top positions in Washington, D.C. In the decade preceding Gaujacq's 2000 promotions, four executives had served as both the head of EDF's delegation in Washington, D.C. and President of EDFINA. Typically, these executives served for a term of two to four years, before moving on to new positions. Gaujacq sought to break this practice when she requested a new three-year contract in January 2003. However, EDF officials declined and merely extended her 2000 Expatriate Contract for one additional year, with a contract expiration of July 31, 2004.

In December 2003, EDF's President, Chairman, and CEO, Francois Roussely, offered Nadal the position of General Delegate for North America. By the end of 2003, EDF's strategic goals and business plans with respect to the United States had changed. The company "wanted to increase its profile in the United States" and, to that end, it sought to "send a top-level executive to Washington as its 'ambassador' . . . to deal with the strategic, financial[,] and political issues" associated with its goal of entering into commercial ventures with energy partners in the United States. Laroche Decl. ¶ 12, 4 J.A. 1688-89. Company officials considered Nadal to be well qualified to assume these responsibilities. After accepting Roussely's offer, Nadal was appointed EDF's General Delegate for North America on January 1, 2004.

Gaujacq knew by January 28, 2004 that Nadal had been appointed to the General Delegate position and she had reason to know that the person in that position typically was appointed President of EDFINA. Gaujacq claims that EDF's Chief Operating Officer ("COO"), Gerard Creuzet, told her in January 2004 that she would remain President of EDFINA until at least 2005. In truth, however, Gaujacq had no such agreement with EDF to extend her term as President of EDFINA. Gaujacq nonetheless acted on her own accord and sent emails to the head of EDF's Americas Branch (to whom she reported) expressing her understanding that Nadal would come on board to develop EDFINA's knowledge of the gas industry, while she would remain in charge of EDFINA and NuStart.

During the first half of 2004, there was mounting tension between Gaujacq and Nadal. Gaujacq continued to demand her own way even though she knew that she had no agreement with EDF to continue as General Delegate or President of EDFINA. After Gaujacq and Nadal met for the first time in person on February 25, 2004, Gaujacq introduced him to the Washington office as a senior advisor focusing on gas and equity markets.

Nadal promptly contacted top officials in EDF to clear up any confusion over their positions. By early March, Nadal indicated that he was having trouble working with Gaujacq, because she continued to express her belief that Nadal's assignment in Washington, D.C. was limited to the gas market and certain financial issues. Nadal again requested "prompt and strong clarification" from EDF officials regarding his position. Email from Christian Nadal to François Metais (Mar. 10, 2004) (translation), *reprinted in* 3 J.A. 1379. Nadal made it clear that he could not share responsibilities with Gaujacq. *Id.*

On March 22 and 23, Gaujacq met with EDF's leadership in Buenos Aires. She was clearly told that Nadal would be President of EDFINA and that she would need to prepare a new mission for herself. On March 25, Gaujacq sent COO Creuzet a proposal pursuant to which she would be in charge of NuStart and report directly to the heads of EDF's Americas Branch and its Energy Branch – rather than to Nadal – as part of a new three-year expatriate assignment in Washington. But there are no facts showing that EDF and Gaujacq ever agreed on this arrangement. Creuzet initially told Gaujacq that her proposal was "well in line with our discussions last week in Buenos-Aires," that he had "no particular comments," and that he would "forward it to [Laroche] to get his comments." Email from Gerard Creuzet to Yann Laroche (Mar. 29, 2004) (translation), *reprinted in* 3 J.A. 1352. The next week, Creuzet proposed an arrangement different from the one sought by Gaujacq. Creuzet and Gaujacq continued to negotiate over her position with EDF through a series of emails. However, Gaujacq never secured an agreement from EDF to extend her contract for another three years, as she preferred. And Nadal continued to express his desire to terminate Gaujacq's activity in his office, stating that she had created a situation that made it impossible for the two to collaborate. Although Gaujacq was never given a three-year contract extension, EDF officials attempted to accommodate her

preference to remain in the United States by offering her a position as a Vice President of EDFINA.

On May 31, Gaujacq took the title of Vice President of EDFINA, a rank she shared with EDFINA's other Vice President, Bernard Dreux. Gaujacq retained her R-3 executive classification, along with her existing salary and benefits. Nadal officially took over as President of EDFINA the next day. Nadal's arrival in the United States precipitated further deterioration in his relationship with Gaujacq. Beginning in June, Gaujacq stopped coming into the EDFINA offices on a regular basis. Gaujacq also sent an unauthorized memo to staff purporting to assign responsibilities for gas and finance matters to Nadal and nuclear matters to herself. Days later, Gaujacq left a conference early and skipped a meeting with Nadal which had been scheduled to discuss her responsibilities as Vice President of EDFINA. Gaujacq initially claimed that she was forced to miss the meeting to return to France to take care of her sick mother-in-law, but this turned out to be a fabrication. Gaujacq also kept confidential documents related to NuStart in her home and refused to return the company documents to the EDFINA offices. Meanwhile, Nadal had revoked Gaujacq's authority to sign checks for EDFINA and designated Dreux as the person who would act as President in Nadal's absence.

In July, Gaujacq complained in writing to top officials at EDF that "Nadal tries, by all means, to prevent me from doing my job and takes discriminatory measures against me." Email from Catherine Gaujacq to Francois Roussely and Gerard Creuzet (July 22, 2004) (translation), *reprinted in* 4 J.A. 1496. She indicated that she would "defend [her]self against [Nadal] by filing a complaint," *id.*, and she also sent an email to Nadal complaining of his treatment of her. Email from Catherine Gaujacq to Christian Nadal (July 22, 2004), 5 J.A. 2296-97. She further complained by phone to senior EDF officers. Gaujacq's notes reflect that in one such conversation, COO Creuzet told

her that he did "not have time to discuss the differences of views between managers" and stated, "[y]our career is dead in EDF if you file the claim." Defs.' Statements Pursuant to FED. R. CIV. P. 56.1 and Local Rule 7(h) Ex. 70, *reprinted in* 4 J.A. 1498; *see also* Email from Catherine Gaujacq to Gerard Creuzet, Yann Laroche, and Fernando Ponasso (July 25, 2004), *reprinted in* 4 J.A. 1505 (describing threat). Gaujacq continued to seek a three-year extension of her expatriation contract, demanding that company officials sign the contract, that she not report directly to Nadal, that Nadal "not interfere" with her mission, and that Nadal reinstate her check-signing authority and ensure her equal status and treatment with the other EDFINA Vice President, Bernard Dreux. *See* Email from Catherine Gaujacq to Gerard Creuzet, Yann Laroche, and Fernando Ponasso (July 25, 2004), 4 J.A. 1505-06. She also requested reimbursement for her legal fees. *See id.*

At the end of July 2004, EDF officials elected to let Gaujacq's 2000 Expatriate Contact to expire, in part because of the "very bad relationship" between Nadal and Gaujacq. Jean-Louis Betouret, Gaujacq Nadal Situation (July 26, 2004), *reprinted in* 4 J.A. 1511-13. EDF officials decided that they would no longer tolerate Gaujacq's demands that she be allowed to freelance outside of the ambit of Nadal's leadership. The decision to let Gaujacq's 2000 Expatriate Contract to expire was approved by the company's president. *Id.* at 4 J.A. 1513. The decision was consistent with EDF's standard practice of rotating executives through its top positions in Washington, D.C.

Creuzet wrote Gaujacq a letter on July 27 confirming that her assignment in Washington, D.C. would end as of August 1, 2004, *i.e.*, at the expiration of her 2000 Expatriate Contract. The letter stated that EDF would give Gaujacq an additional three months to arrange her move back to France and that the company expected her to start on November 1 at a position in France in the Energy Department that was "'appropriate to [her]

level of responsibility and the experience that [she had] acquired.'" *Gaujacq*, 572 F. Supp. 2d at 85 (quoting Defs. Ex. 74). The company invited her to continue discussions she had started with the head of EDF's Energy Branch earlier in 2004, when he had offered her an important position working on nuclear issues in France. The head of the Energy Branch in fact called Gaujacq that day to discuss a project. Gaujacq conceded that the project was "important" to EDF but "[n]ot really" important "[f]or me." Dep. of Catherine Gaujacq at 428 (Mar. 16, 2006), *reprinted in* 2 J.A. 919.

Gaujacq filed a complaint with the Equal Employment Opportunity Commission several days later, on July 30, 2004. In early September 2004, Gaujacq requested more information from EDF about her potential new assignment in France. She was advised by EDF that she would manage the development of a new series of nuclear reactors. *See Gaujacq*, 572 F. Supp. 2d at 85. Gaujacq claimed that the proposed new position was one with lower responsibilities than her past three assignments at EDF and that it "ha[d] no substance and [was] devised to shel[ve] me." Letter from Catherine Gaujacq to Bruno Lescouer (Oct. 7, 2004) (translation), *reprinted in* 4 J.A. 1555. On October 28, Gaujacq declined the new position, and she failed to report to work as scheduled on November 2. EDF officials met with her in December to discuss her situation, but no satisfactory resolution of the issue was reached. Gaujacq was terminated on January 6, 2005 after she persisted in refusing to accept employment on the terms offered by the company.

## B.  *Proceedings Below*

On May 13, 2005, Gaujacq filed a complaint against EDF, EDFINA, and Nadal, alleging that: (1) EDF and EDFINA ("the company") violated Title VII and the DCHRA by discriminating against her based on sex, and that Nadal aided and abetted this discrimination in violation of the DCHRA; (2) EDF and EDFINA retaliated against Gaujacq for complaining of

discrimination in violation of Title VII and the DCHRA, and that Nadal aided and abetted the company's retaliation in violation of the DCHRA; (3) that EDF and EDFINA violated the Equal Pay Act; (4) that EDF and EDFINA tortiously interfered with Gaujacq's contractual relations with future employers and that Nadal tortiously interfered with her contractual relations with EDF; (5) that EDF and EDFINA breached portions of her expatriate contract; (6) that EDF and EDFINA breached a duty of good faith and fair dealing by willfully rendering imperfect performance of her contracts with the company; and (7) that EDF, EDFINA, and Nadal defamed her. *See* Compl. (May 13, 2005), *reprinted in* 1 J.A. 23-81.

Discovery closed in July 2006 and the defendants filed motions for summary judgment on October 16, 2006. Gaujacq moved in March 2008 for leave to supplement her opposition to the defendants' summary judgment motions and filed a motion to compel discovery in April of that year. *See* Mot. and Mem. for Leave to Supplement Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Mar. 5, 2008), *reprinted in* 7 J.A. 3227-31; Pl.'s Mot. to Compel and for Sanctions (Apr. 23, 2008), *reprinted in* 7 J.A. 3372-73. Both motions were based on evidence that was allegedly concealed by EDF and Nadal pertaining to Nadal's conduct while he worked in Argentina as the CEO of EDENOR. The District Court granted summary judgment on all claims and did not specifically address either of Gaujacq's motions in its order. *See Gaujacq*, 572 F. Supp. 2d at 83-84.

Gaujacq filed a timely appeal. She does not contest the District Court's grant of summary judgment on her tortious interference with contract and business relations claims against the company or on her defamation claims against the company and Nadal. Gaujacq argues that the District Court erred in dismissing her other claims, and also argues that the District Court should have granted her motions to reopen discovery and supplement her opposition to the summary judgment motions.

## II. ANALYSIS

### A. *Standard of Review*

This court reviews the District Court's grant of summary judgment *de novo*. *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004). "Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(c)). "A dispute about a material fact is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). In determining whether there are genuine factual issues in dispute, the court draws all reasonable inferences in favor of the nonmoving party. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam).

We review for abuse of discretion the motions for further discovery and to supplement an opposition to summary judgment. *See Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1415 (D.C. Cir. 1995).

### B. *Equal Pay Act*

Appellant first argues that the District Court erred in granting summary judgment to appellee on her Equal Pay Act Claim. We disagree. Where a plaintiff establishes a *prima facie* case of disparate pay under the Equal Pay Act, a defendant can avoid liability by pleading an affirmative defense justifying a pay disparity if it is "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The District Court correctly found that EDF satisfied the fourth affirmative defense. *See Gaujacq*, 572 F. Supp. 2d at 91. Gaujacq and Nadal were paid according to their rank in EDF's top-level executive system, a pay scale that is based on factors other than sex. *See id.* Although this system was based in part on

subjective factors, "subjectivity is permissible" in employment decisions "provided that there are demonstrable reasons for the decision, unrelated to sex." *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir. 1980). Moreover, EDF's executive compensation policy specifically states that "[e]xecutives who hold positions at the same level do not necessarily receive the same compensation, which will vary according to the level of individual contribution achieved and also according to the number of positions held within the same level." Electricité de France Executives Compensation Policy at 6 (translation), *reprinted in* 4 J.A. 1828.

On the undisputed record in this case, there is no doubt that the pay disparity between Nadal and Gaujacq was based on factors other than sex. Nadal had substantially more management experience than Gaujacq, including a stint on the company's Executive Committee between 1995 and 1999. There is nothing in the record to suggest that he was unworthy of the R-1 classification that he received in 2000. Indeed, Nadal had been a senior executive for some time before 2000, so his R-1 classification was hardly noteworthy. Nor is there anything in the record to suggest that Gaujacq was undervalued when she received an R-3 classification when she was first promoted into the senior executive service in 2000. Furthermore, the record indicates that EDF's strategic goals and business plans with respect to the United States were significantly changed and upgraded at the time when Nadal was brought to Washington, D.C. in 2004. Nadal was assigned to the Washington, D.C. positions specifically because he was especially well qualified to assume the new responsibilities that the company had in mind for the General Delegate and President of EDFINA. In short, the pay differential between Nadal and Gaujacq was justified based on "experience, training or ability of an employee [which] may justify salary differentials, provided they are not based upon sex." *Aetna*, 616 F.2d at 725. No reasonable jury could find otherwise.

**C.** *Gender Discrimination*

We also affirm the District Court's grant of summary judgment on appellant's gender discrimination claims. Appellant argues that a genuine issue of material fact exists as to whether EDF's asserted nondiscriminatory reasons for its actions are pretextual, and that the District Court failed to analyze her aiding and abetting claim against Nadal under the DCHRA. Neither argument has merit.

Title VII prohibits discrimination by an employer against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The DCHRA contains a similar provision. *See* D.C. CODE § 2-1402.11(a). The District Court found that Title VII applies to foreign companies operating in the United States and protects aliens working in the United States as well as U.S. citizens. *See Gaujacq*, 572 F. Supp. 2d at 86-87. Appellees do not dispute this.

Title VII and DCHRA discrimination claims are assessed pursuant to the three-step framework set forth in *McDonnell Douglas Corp. v. Green*. *See* 411 U.S. 792, 802-03, 807 (1973); *see also Howard Univ. v. Green*, 652 A.2d 41, 45 & n.3 (D.C. 1994) (applying *McDonnell Douglas* framework to DCHRA cases). In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), we made it clear that when "an employer has asserted a legitimate, non-discriminatory reason" for an alleged adverse action, the District Court need only "resolve one central question" when considering a motion for summary judgment: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494. In this case, EDF proffered legitimate, nondiscriminatory reasons for Gaujacq's claimed adverse actions, and the District

Court properly analyzed Gaujacq's discrimination claims under the *Brady* framework. *See Gaujacq*, 572 F. Supp. 2d at 87.

On the record before us, no reasonable jury could find that Gaujacq was a victim of discrimination based on her gender. She was replaced in the positions of General Delegate and President of EDFINA in the normal course of work, as her contract expired. And she was treated no differently than the persons who had preceded her in the positions of General Delegate and President of EDFINA. Indeed, appellant was favored when EDF assigned her to serve as a Vice President of EDFINA in an effort to accommodate her desire to stay in Washington, D.C. The company reassigned her to a high level position in France only after her obstructionist behavior made it clear that she would not work cooperatively with Nadal. And she was terminated only after she refused her new assignment in France. None of these employment actions resulted from discrimination based on gender. And because EDF did not discriminate against Gaujacq, it is clear that Nadal did not aid and abet any unlawful discrimination. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

## D. *Retaliation*

Appellant next argues that the District Court erred in rejecting her claims of retaliation under Title VII and the DCHRA. She points to three instances in which she suffered materially adverse actions that resulted in unlawful retaliation: (1) when EDF officials allowed her 2000 Expatriate Contact to expire at the end of July 2004 and reassigned her to a new position in France; (2) when she was terminated on January 6, 2005 after she refused to accept her new assignment in France; and (3) when Creuzet told her on July 23, 2004 that "[y]our career is dead in EDF if you file a claim." Appellant's Br. at 35.

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because he

has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington*, 548 U.S. at 59 (quoting 42 U.S.C. § 2000e-3(a)). The DCHRA also contains an anti-retaliation provision. *See* D.C. CODE § 2-1402.61. As we recently explained in *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009),

> retaliation claims based on circumstantial evidence . . . trigger the familiar burden-shifting framework of *McDonnell Douglas*. Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two. If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions. If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation.

*Id.* at 677 (citations and quotations omitted); *see also Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 235-36 n.3 (D.C. Cir. 1999) (applying *McDonnell Douglas* framework to DCHRA retaliation claims). The Supreme Court has distinguished Title VII's anti-retaliation provision from its substantive anti-discrimination provision, holding that a "materially adverse" action for purposes of a retaliation claim is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57; *see also Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008). In other

words, the proscription against retaliation sweeps more broadly than the proscription against gender discrimination. *See Burlington*, 548 U.S. at 66-67.

Applying these tests, we have no trouble in disposing of appellant's first two claims of alleged retaliation. The undisputed evidence in the record indicates that EDF officials elected to transfer Gaujacq to France when her contract expired, in part because she effectively refused to cooperate with Nadal, under whom she would have been assigned to work had she remained in Washington, D.C. Gaujacq's contract expired at the end of July 2004 and she had no right to remain in Washington, D.C. EDF elected to utilize Gaujacq's nuclear power expertise on a project in France. Gaujacq conceded that the project was "important for the company" but "[n]ot really" important "[f]or me." Gaujacq Dep. at 428, 2 J.A. 919; *see also Gaujacq*, 572 F. Supp. 2d at 90.

Given these facts, no reasonable jury could find that EDF officials retaliated against Gaujacq when they elected to assign her to a new and important position in France after her contract expired. Likewise, EDF surely did not retaliate against Gaujacq when they terminated her after she refused to work in France. In short, we agree with the District Court that EDF proffered legitimate, nondiscriminatory reasons for Gaujacq's reassignment and termination, and that Gaujacq offered nothing to rebut this evidence to suggest that the company intended to retaliate against her.

Appellant's third claim of retaliation – Creuzet's statement that "[y]our career is dead in EDF if you file the claim" – also fails. A threatening verbal statement, standing alone, might well constitute a materially adverse action. However, in assessing such a claim, *Burlington* emphasizes that "[c]ontext matters" and that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington*, 548 U.S. at 69. Therefore, a statement that literally appears to

be threatening is not necessarily a materially adverse action. An employer's words and other actions must be considered in context to determine whether they would "dissuade a reasonable worker" from filing a claim and thus result in actionable retaliation. *See id.* at 57.

Gaujacq contends that Creuzet's statement was a materially adverse action sufficient to make out a *prima facie* case of retaliation. We disagree. In the context of this case, a reasonable worker in Gaujacq's position would not have taken Creuzet's brief, fleeting, and unadorned verbal statement as an act or threat of retaliation. Both before and after Creuzet's statement, top EDF officials went out of their way to accommodate Gaujacq's desire to stay in the United States, despite her increasing insubordination and refusal to consider any future employment decision that did not meet her precise demands. Neither her contract nor company practice gave Gaujacq any right to remain in Washington, D.C. once she completed her term as General Delegate and EDFINA President. Yet, EDF officials indulged her at every turn – first by extending her contract by a year, then by negotiating with her to find a way to allow her stay in Washington, D.C., and finally by creating a Vice President's position for her. But nothing that the company did satisfied Gaujacq and she persisted in disparaging Nadal's authority and refusing to cooperate with him.

Creuzet's disputed statement to Gaujacq came at a time in late July when Gaujacq was telephoning company officials to complain again about her situation with Nadal. Creuzet first told her that he did "not have time to discuss the differences of views between managers" and then stated, "[y]our career is dead in EDF if you file the claim." In this context – given all that the company had done for her – Creuzet's statement appears less a threat than an expression of exasperation over Gaujacq's ongoing antics. After all, it was Creuzet who spent so much time earlier in the year negotiating with Gaujacq in an effort to

find a way for her to remain in Washington, D.C. No reasonable employee who received as much accommodation as did Gaujacq could construe Creuzet's statement as an unlawful retaliatory threat. Therefore, in the "particular circumstances" of this case, we hold that the verbal statement made by Creuzet did not constitute a materially adverse action. *Burlington*, 548 U.S. at 69.

Because we uphold the District Court summary judgment in favor of EDF on the retaliation claim, we likewise affirm the summary judgment in favor of Nadal on the related aiding and abetting claim. *See Halberstam*, 705 F.2d at 477.

## E. *Common Law Claims*

Gaujacq also argues that the District Court erred in dismissing her several common law claims: the company's alleged breach of (1) the 2000 Expatriate Contract; (2) a purported 2004 expatriate contract; and (3) the duty of good faith and fair dealing; as well as (4) Nadal's alleged tortious interference with contractual relations and business expectancy. We affirm the dismissal of all of Gaujacq's claims except one, which we remand to the District Court for further consideration.

### 1. *Breach of 2000 Expatriate Contract*

Gaujacq claims two breaches of her 2000 Expatriate contract. First, she argues that EDF failed to reimburse her for business expenses that she incurred and for which she was supposed to be compensated under the agreement. Second, Gaujacq argues that EDF failed to conduct an interview with her at least six months prior to her return to France, as required by EDF's "Guide to EDF Employees Working Abroad" ("Guide"), which was incorporated by reference into the 2000 Expatriate Contract.

We easily dispose of Gaujacq's second claim. The Guide provides that in order to "encourage the promotion of

international mobility as part of career development," it is "appropriate" for management to conduct an "evaluative discussion" at least six months before the expatriate returns to France. Management Guide for Agents Working Abroad, *reprinted in* 4 J.A. 1639. Even if this provision creates a contractual obligation on the part of EDF's management – a doubtful claim at best – EDF satisfied its obligations. In the early part of 2004, Gaujacq was in constant consultation with top officials at EDF, several of whom discussed career options with her and then labored to find a way to accommodate her desire to stay in the United States.

The District Court failed to analyze Gaujacq's first claim for breach of contract, *i.e.*, the company's alleged failure to reimburse her for expenses. Because this claim was raised below and preserved on appeal, we remand to allow the District Court to address this issue in the first instance. *See Saksenasingh v. Sec'y of Educ.*, 126 F.3d 347, 351 (D.C. Cir. 1997) ("If the District Court had original jurisdiction, but dismissed for non-jurisdictional reasons, then it [may] maintain supplemental jurisdiction at its discretion.").

2. *Breach of 2004 Expatriate Contract*

Gaujacq also claims that EDF breached a purported "2004 Expatriate Contract," arguing that a contract formed after she emailed Creuzet details of her new mission in the United States and Creuzet accepted the proposal on behalf of EDF on March 29, 2004. We reject this claim, because the facts do not support it.

Assuming, as appellant argues, that District of Columbia law applies, *see* Appellant's Br. at 44, we agree with the District Court that Gaujacq never reached a second contract with EDF to continue working in the United States. *See Gaujacq*, 572 F. Supp. 2d at 93. Under District of Columbia law, a valid and enforceable contract requires (1) the intention of the parties to

be bound, and (2) agreement as to all material terms. *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007). During his negotiations with appellant, Creuzet made it clear that he would forward Gaujacq's proposal to the head of human resources to get his comments. However, he never reached an agreement with Gaujacq on behalf of EDF. Rather, Gaujacq and Creuzet continued to negotiate over possible employment arrangements. The undisputed evidence plainly shows that EDF did not intend to be bound to Gaujacq's proposed terms. Therefore, no enforceable contract existed and summary judgment on this claim is proper.

### 3. *Breach of Duty of Good Faith and Fair Dealing*

Appellant also asserts that the company breached its duty of good faith and fair dealing with respect to the 2000 Expatriate Contract and the purported 2004 agreement. As noted above, EDF and Gaujacq never concluded a second expatriate contract in 2004. However, assuming, as appellant argues, that District of Columbia law applies, the 2000 Expatriate Contract "contain[s] an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (internal quotation marks and citations omitted). EDF does not dispute this. Rather, EDF argues that it did not engage in "'bad faith'" by "'violat[ing] standards of decency, fairness or reasonableness,'" and that it did not engage in any arbitrary or capricious action towards Gaujacq. *See id.* at 201-02 (quoting Restatement (Second) of Contracts § 205 cmt. a). We agree. As the District Court explained, Gaujacq's contract "came to its natural and agreed-upon conclusion in July 2004," and EDF never agreed to extend the old contract or execute a new one. *See Gaujacq*, 572 F. Supp. 2d at 93.

### 4.  *Tortious Interference With Contract*

Lastly, appellant contends that Nadal tortiously interfered with the 2000 Expatriate Contract and the purported 2004 contract, or with a commercially reasonable business expectancy with respect to the proposed 2004 contract.  These claims fail.  A defendant can avoid liability for tortious interference with contract and with business relations if the defendant can establish that his conduct was legally justified or privileged.  *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads Inc.*, 565 A.2d 285, 289-90 (D.C. 1989); *see also McManus v. MCI Commc'ns Corp.*, A.2d 949, 958 (D.C. 2000).  District of Columbia "law affords to a supervisor . . . a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers – those who have the power to hire and fire." *Sorrells*, 565 A.2d at 291.  This privilege does not apply where "the supervisor acts with malice for the purpose of causing another employee's contract to be terminated." *Id.*  Gaujacq's claims are meritless, because she points to no evidence showing that Nadal's motivation for his actions was other than legally justified.  Gaujacq's insubordinate and obstructionist conduct made it virtually impossible for Nadal to work with her.  He committed no legal wrong when he expressed his dismay over the situation.

## F.  *Gaujacq's Procedural Motions*

Appellant lastly takes issue with the District Court's implicit denials of her motions to supplement her opposition to defendants' motions for summary judgment and to compel discovery.  We think it is plain that the District Court meant to deny appellant's motions when it granted appellees' motions for summary judgment and dismissed the case.  The District Court did not abuse its discretion in denying appellant's motions.

This court is "especially reluctant to interfere with district court decisions regarding their own day-to-day operations,"

particularly the District Court's "broad discretion in structuring discovery." *Hussain v. Nicholson*, 435 F.3d 359, 363 (D.C. Cir. 2006) (internal quotation marks and citation omitted). Gaujacq's motions claimed that reopening discovery would have allowed her to defeat EDF's claims that Nadal was more qualified than Gaujacq and that he possessed a superior performance record, because his tenure as CEO of EDENOR "resulted in criminal prosecutions and a billion dollar loss to EDF." *See* Mem. in Support of Pl.'s Mot. to Compel and For Sanctions at 2-3 (Apr. 23, 2008), 7 J.A. 3375-76; *see also* Mot. and Mem. for Leave to Supplement Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 4, 7 J.A. 3230. However, appellant's submissions make clear that the Argentinian investigation showed no cause for prosecuting Nadal, who was not indicted. *See* Mot. and Mem. for Leave to Supplement Pl.'s Opp'n to Defs.' Mot. for Summ. J. Ex. 12, *reprinted in* 7 J.A. 3340; Defs.' Opp'n to Pl.'s Mot. for Leave to Supplement Ex. 1, *reprinted in* 7 J.A. 3370 (translated copy of plaintiff's Exhibit 12). Moreover, indictments brought against other EDENOR employees were ultimately dismissed. *See* EDENOR Form 6-K at 77 (Aug. 2007), Mot. and Mem. for Leave to Supplement Pl.'s Opp'n to Defs.' Mot. for Summ. J. Ex. 11, *reprinted in* 7 J.A. 3309. The District Court did not err in denying appellant's motions.

## III. CONCLUSION

For the foregoing reasons, we remand this case to the District Court to consider Gaujacq's breach of contract claim pertaining to the reimbursement of business expenses. We affirm the judgment of the District Court as to all other claims.