Martha SMITH, Appellant,

v.

DISTRICT OF COLUMBIA OFFICE
OF HUMAN RIGHTS, et al.,
Appellee.

No. 11–CV–1623.

District of Columbia Court of Appeals.

Argued April 25, 2013.

Decided Oct. 17, 2013.

Ryan P. Chapline and Robert B. Fitzpatrick, Washington, DC, with whom Francis T. Coleman, Catholic Charities of the Archdiocese of Washington, was on the brief, for appellant.

Carl J. Schifferle, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before THOMPSON and BECKWITH, Associate Judges, and RUIZ, Senior Judge.

RUIZ, Senior Judge:

This appeal stems from the trial court's denial of Martha Smith's petition for review of a decision by the District of Columbia Office of Human Rights ("OHR") that her claims of discrimination in employment were not supported by probable cause. Appellant filed a charge of discrimination with OHR against the District of Columbia Department of Youth Rehabilitation Services ("DYRS") alleging disparate treatment, D.C.Code § 2–1402.11 (2001); sexual harassment and hostile work environment, *id.;* retaliation, D.C.Code § 2–1402.61; and constructive discharge, D.C.Code § 2–1402.11. OHR issued a letter of determination on September 24, 2007, finding no probable cause to support appellant's claims. Appellant filed a petition to vacate OHR's determination and remand for fur-

ther investigation in the Superior Court of the District of Columbia. On November 9, 2011, the Honorable Craig Iscoe denied appellant's petition for review, and appellant timely filed an appeal with this court. We conclude that we cannot uphold OHR's determination because it did not consider all the evidence and claims made. We, therefore, reverse and remand for further proceedings.

## I. Factual Background

Appellant was hired by DYRS as a correctional officer on May 2, 2005. She worked at DYRS's Oak Hill Youth Center in Laurel, Maryland, until November of that year. Appellant's complaint to OHR highlighted several incidents that, she claimed, evidenced discrimination and retaliation, constituted a hostile work environment, and eventually forced her to leave her employment at Oak Hill. We summarize them here.

In August 2005, appellant contacted Alfreda Powell, another correctional officer, to obtain shirts for some of the residents in her unit. Appellant and Powell entered a storage closet to retrieve the shirts, and when appellant was about to leave, Powell stopped her and asked her how many shirts she had taken. Before appellant could leave the closet, Powell "felt [appellant's] [b]reast several times." Appellant described being "in a state of shock" and remembered calling Powell over a speaker phone when she returned to her office to tell her not to touch her breast in the future. Powell's response was to laugh. Later, at a meeting with several supervisors, including Watch Commander Tyrone Bryant and Acting Superintendent Terence Wright, Powell denied groping appellant; instead, she accused appellant of placing her breasts on her. Bryant and another supervisor told appellant and Powell that they could be fired as they were still probationary employees.[1]

The following month, in September 2005, James Edwards, a correctional officer assigned to another unit, made disparaging comments to appellant. When appellant entered his unit, Edwards would tell her, in front of the Oak Hill residents, to "get the fuck out." One day, appellant approached Edwards in the staff parking lot to confront him about his behavior. In front of Howard Terry and William Raper, two fellow correctional officers, appellant asked Edwards to "stop disrespecting" her and told him "[i]n a joking way" that "[she] was going to get [her] belt." After Edwards showed appellant his belt, appellant told him, "[Y]our belt is bigger than mines [*sic*]." Then in a "playing" manner, appellant told Terry to get "[her] nine." Edwards then took out a gun from his truck, and appellant immediately left the area. The next day, appellant went to Edwards' unit, and Edwards told her again to "get the fuck out." Appellant reported the incident to Wright, who was one of her supervisors.

In October 2005, appellant asked another supervisor, Watch Commander Tyrone Bryant, for assistance with a copier machine. According to appellant, Bryant responded, "You have to be gentle with it open it like you open your legs and then you put it in easy and then you come with it." Appellant reported the incident to an unidentified supervisor, but said that she received no response. Appellant also alleged in her complaint that other correctional officers called her names, such as "Nigger Bitch," and treated her in a demeaning manner.

1. Appellant also described a later incident with Powell when appellant had to get keys from another office. Appellant saw Powell sitting at a desk in the office and knocked on the window to get her attention to open the door. Although some of the residents told Powell that appellant was at the door, Powell refused to open it.

Appellant claimed that one day (she did not identify the date) during roll call, Wright told a group of correctional officers, including her, that if "females" "go to EEO[,]" "some of you all will not be working here next week, month or next year."

In October 2005, Appellant requested a transfer to another DYRS facility, Youth Services Center ("YSC"), located in the District of Columbia, "due to the harassment and mental stress that [she] was subjected to daily." [2] Appellant had several meetings with Acting Superintendent LaVern Evans about her desire to transfer to YSC. Evans told appellant that she could not be transferred as YSC did not need any female officers. After her request to transfer to YSC was denied, appellant resigned from DYRS in November 2005. On November 12, 2005, she prepared and signed a letter, addressed "To whom it may concern," that detailed the reasons for her resignation: denial of her transfer request, sexual harassment, hostile work environment, and armed assault by a coworker. Appellant requested an "exit letter" so that her complaints could be investigated.

## II. Procedural Background

### A. Appellant's Complaint

On December 29, 2005, appellant, who had no lawyer, completed a handwritten complaint, on an OHR form, in which she alleged that she had been subjected to sex discrimination and harassment. The second page of the form asked the basis of the complaint and listed several options, including race, national origin, sex, religion, familial status, etc. Appellant checked the box next to "Sex." The next page of the form asked "[w]hat action was taken that made [appellant] feel [she was] treated differently." In the row labeled "Family Medical Leave," appellant checked "Transfer," and in the row labeled "Sexual Harassment," she checked "Hostile Work Environment" and "Retaliation." Under the section labeled "Witnesses," appellant listed "Mark Bryant, Supervisor" and "Mr. Terry" along with their telephone numbers. Other forms contained appellant's answers to "Intake Questions" concerning the allegations of sexual harassment, racial harassment, and constructive discharge. These forms included the names of persons she accused as harassers, supervisors to whom she complained, and witnesses to the harassment. In several handwritten pages attached to the complaint, appellant detailed her allegations.[3]

On the same day appellant completed the complaint form, OHR prepared a

---

2. Appellant also stated that "[she] requested a transfer due to the harassment and lack of transportation which was denied."

3. The incident with Powell:

. I realized I needed two tee shirts for the residents.... I call[ed] ... Officer Powell[.] She informed me to enter the storage closet and get the tee shirts.... Upon myself leaving, Officer Powell asked me how many shirts I had. I told Officer Powell I had two tee shirts. I could not believe she was questioning me about the tee shirts due to the fact [the assigned units] share items. I was entering [my] unit before I could get the door open[,] Officer Powell felt my

[b]reast several times. I actually was in a state of shock.

\* \* \*

We had a conference[.] The Watch Commander, Mr. Tyrone Bryant, Assistant Supertendant [sic] Mr. Wright[,] Union Representative Mr. Adams, Supervisor Mark Bryant, myself and Officer Powell was present.... I informed Officer Powell my breast is not to be touch[ed] at that time. Asst[.] Supertendant [sic] Mr. Wright mentioned we need a female supervisor in here.... Officer Powell made a false accusation [stating] I walked up to her and put both of my breast[s] on her. I immediately started crying. I really started crying harder when Mr. Adams and Tyrone Bryant mentioned

typed "Charge of Discrimination" and two-page affidavit, which appellant signed.[4] The Charge and affidavit raised appellant's allegations of sexual harassment, harassment, retaliation, and constructive discharge, and summarized the incidents that fell within those allegations. Notably, however, the Charge of Discrimination and affidavit omitted appellant's allegation that during roll call, Wright had said that female officers who complained to EEO would not be in the office "next week, month or next year."

On January 3, 2006, OHR notified DYRS of the charge. OHR also prepared a request for information (undated), which was submitted to DYRS. The request asked DYRS to provide information concerning DYRS policies and appellant's allegations of constructive discharge, harassment, and sexual harassment; it did not, however, ask any questions about appellant's complaint of retaliation.

On January 9, 2006, Ms. Melissa Sharpe–Jones, the OHR investigator assigned to the case, sent appellant a letter, advising her that the investigator's role is "that of a neutral, independent fact finder and not as an advocate for either party." The letter also instructed appellant that "[a]s the charging party, the burden of

the both of us could be fired[.] I requested for a transfer. I forward[ed] my request to the Watch Commander Tyrone Bryant.
The incident with Edwards:
Officer Edwards verbally totally disrespected me on several occasion[s]. His attitude is not acceptable. Every time I enter [his] unit he will tell me in front of residents get the fuck out. [On Sept 13, 2005] I ended my tour of duty [and] I walked to the staff parking lot. Mr. Terry and Mr. Raper and Mr. Edward[s] was present. I approach Mr. Edwards and told him to stop disrespecting me. In a joking way I told Mr. Edwards I was going to get my belt and he showed me his belt. I said your belt is bigger than mines. I was playing[.] I told Mr. Terry get my nine. I observed Officer Edwards retrieve[ ] a gun from his truck. I immediately left the area. The next day, I enter[ed] [Edwards's] unit.... He told me again get the fuck out. I told Officer Edwards I was going to report him. I opened the door. Officer Edwards tried to stop me.... I told [Asst Superintendent Wright] what happen.... I cried so hard I injured my left eye for a week.
The incident with Bryant at the copier machine:
On October 12, 2005—I need some assistance with the Xerox machine. I asked Officer Otis [but] he could not get the Xerox machine to work. I[saw] the Watch Commander Mr. Tyrone Bryant walk[ ] by. I asked Mr. Bryant to help me with [the] Xerox machine. I did not appreciate his comments ... You have to be gentle with it[,] open it like you open your legs and then

you put it in easy and then you come with it.
Hostile work environment:
I was treated so unfair which included unwelcome misconduct creating an intimidation hostile offensive working environment including sexual harassment[,] offensive comments[,] jokes[,] obscene language[,] and degrading words. I never had an evaluation or was granted a handbook.

\* \* \*

I was informed the agency does not have an EEO office....
Request for a transfer:
I had several conference[s] with Acting Supertendant [sic] Mr. Evans to request a transfer. He informed [me] I could not be transfer[red]. He stated [YSC] did not need any females..... I observed several females to be transfer[red].
Wright's statement during roll call:
Assistant Supertendant [sic] Mr. Wright made a statement in [r]oll [c]all. He said this is for the females[,] you can go to EEO[,] some of you all will not be working here next week, next month[,] or next year. I truly honest[ly] realized the [accusation] was towards me due to a previous conference with Mr. Wright inquiring about a transfer.

4. Appellant signed the complaint to OHR with her given name, "Martha Jones;" her suit in Superior Court and this appeal, however, are brought in the name of "Martha Smith."

proof rests upon [her]." The investigator sent a similar letter to DYRS, asking them to respond to the allegations in the complaint [5] and to the request for information. The investigator informed both parties that once all submissions were received, "OHR [will then] review the entire record and make a determination on whether or not there is probable cause to believe discrimination occurred."

On January 17, 2006, appellant sent a letter to the investigator stating that she discovered that "pertinent" information was omitted from the formal charge. Most relevant to her case, appellant stated, "The acting superintendant [sic] threatened to terminate my employment in a week, month or year as a female thur [sic] plotting and scheming." Appellant "truly believed" that Wright's roll call statement during roll call was directed at her. This was a reference to the statement made by Wright during roll call that appellant had alleged in her handwritten complaint, but had been left out of the Charge prepared by OHR. There is no indication in the record that the OHR investigator responded to this letter, alerted DYRS of the omission, or otherwise took any action because of it.

## B. DYRS's Position Statement

On March 2, 2006, DYRS filed its position statement, along with affidavits from Evans, Wright, and Bryant. As to the August 2005 incident in the storage closet with Powell, DYRS claimed that appellant waited a week to report the unwanted contact and that a meeting was immediately held with supervisors. At the meeting, according to DYRS, appellant and Powell agreed that the incident was a misunderstanding and that "[i]t was probable that during [Powell's] attempt to retrieve the

shirt, [she] may have made contact with [appellant's] breast." In their affidavits, Wright and Bryant stated that the confrontation between the two women was the result of a misunderstanding and that at the meeting, "they laughed" about it. Wright's affidavit confirmed appellant's statement that appellant and Powell were told at the time that "they were probationary employees and could be terminated for any reason during their probationary period."

With respect to the September 2005 incident in the parking lot with Edwards, DYRS reported that after appellant complained, Edwards was "summarily removed from the Agency the next day." Edwards challenged his removal, and after a hearing, the case against Edwards was dismissed and he was reinstated to his position. As to the October 2005 incident with Bryant at the copier machine, DYRS responded that appellant never registered a complaint and in his affidavit Bryant denied that he made suggestive comments. As to appellant's general assertion that she was subjected to derogatory name-calling and demeaning treatment, DYRS claimed that such incidents were not brought to their attention.

Concerning the denial of appellant's request for a transfer from Oak Hill to YSC, DYRS explained that the D.C. facility was not staffed by transferred correctional officers, but by new hires. Evans's affidavit stated that in August or September 2005, appellant asked for time off so she could enter a drug treatment program. Evans granted this request, and appellant was out of the office for a week and a half. Evans stated that after appellant returned, she threatened to quit repeatedly, "as of-

---

5. The OHR letter contained in the appendix refers to an enclosed "Complaint," but none is attached to the letter. Thus, we cannot tell whether DYRS received the complaint form completed by appellant by hand, the typed Charge of Discrimination prepared by OHR, or both.

ten as once or twice a week." "In order to provide support to [appellant] during this period, [Evans] gave her [his] work, personal cell, and home phone numbers." Evans also claimed that about a month after appellant had resigned, she called and asked to return.

DYRS named and provided contact information for Raper, Edwards, Terry, and Wright, as witnesses who may have information about appellant's allegations. DYRS did not furnish information in response to a question asking for the names of other employees who worked with appellant, saying only that "[appellant] worked with a large [number] of other Correctional Officers during her respective shifts .... the Agency has already provided the information requested as it pertains to coworkers aware of the incident."

### C. Appellant's Rebuttal

On August 1, 2007, a year after DYRS submitted its response to OHR, the OHR investigator sent appellant a two-page "summary of [DYRS's six-page] position statement and documentation" and a letter advising her that she had a right to submit a rebuttal statement. Appellant was instructed that she had five days to submit her response along with any affidavits, all of which had to be signed, sworn, and notarized. After receiving a few days' extension, appellant submitted her rebuttal on August 11, 2007.

Still without a lawyer, appellant countered DYRS's response. She insisted that she reported the incident with Powell the same day it happened, and that the meeting with the supervisors also was held the same day. Appellant disputed DYRS's characterization of the incident as a misunderstanding that was resolved during the meeting. In fact, Powell had told the supervisors during the meeting that it was appellant who had placed her breasts on Powell. Appellant maintained that she reported all incidents in her complaint to her supervisor, including the incident with Bryant at the copier. As to the denial of her request for a transfer, appellant stated that DYRS is incorrect that no correctional officers had been transferred to YSC. Appellant "estimate[ed] that about 10 or more female Correctional Officers were transferred from Oak Hill to YSC" but that she "cannot recall any specific names of those transfers." In addition, appellant stated, "Although [she] can identify many witnesses to several of the incidents of harassment and derogatory conduct, [she] believes these witnesses are hesitant to participate because they fear for their own jobs."

Two days later, on August 13, 2007, appellant submitted a supplemental *pro se* statement to OHR, in which she repeated that she had informed supervisors about the "unwanted and unpleasant harassment" she endured. She also said that she had been told by Bryant and Evans that she would receive a transfer. Along with the supplemental statement, appellant presented several documents, including: (1) the intake form from the D.C. Employment Justice Center's Workers' Rights Clinic, dated October 19, 2005, in which she claimed she had been sexually harassed; (2) her January 17, 2006, letter to the OHR investigator pointing out the omission in the Charge of Discrimination prepared by OHR; (3) a copy of an email to Acting Superintendent Evans, dated October 23, 2005, in which she requested a transfer due to harassment and derogatory treatment; (4) her resignation letter, dated November 12, 2005, in which she describes the adverse effects of the harassment; and (5) a copy of an email, dated December 2, 2005, to DYRS Director Vincent Schiraldi, in which she detailed the incidents that led to her resignation. The record does not indicate whether this supplemental statement and its accompanying

documents were sent to DYRS for response.

### D. The OHR Investigation

The record reveals that the OHR investigator contacted Terry, one of appellant's co-workers who had been identified by appellant and DYRS, for an interview on August 27, 2007. In response to a question about whether he ever witnessed appellant being harassed, Terry responded, "Everybody knew she was being harassed . . . This place thrives on mistreating people. People were told not to help [appellant]." In addition, Terry reported that "[t]he supervisor, Mark Bryant told people not to write any statements for her or help her." Terry observed that "[t]he agency is run out of a fear factor." Terry said that he was "going by what was told and what was heard. [He] didn't see anything;" but he did admit that he witnessed the September 2005 incident with Edwards. Terry suggested that "[appellant] has no one to support her allegations" because "Management intimidated a majority of the witnesses." Terry characterized DYRS's treatment of appellant as "an administrative lynching." [6]

On August 28, 2007, the investigator contacted Raper, a co-worker who had been mentioned in appellant's complaint and identified as a witness by DYRS, but Raper "declined to cooperate." No reason was given for Raper's unwillingness to be interviewed, and apparently no further attempts were made to contact him or to compel his participation. It does not appear from the record that any other co-workers were interviewed. The only other statements (not interviews) in the record were the affidavits from supervisors (Evans, Wright, and Bryant) included with the DYRS Position Statement.

### E. OHR Letter of Determination

On September 24, 2007, OHR issued a Letter of Determination, finding no probable cause to support any of appellant's claims. OHR found no probable cause for the disparate treatment claim, finding that appellant did not prove that the denial of her transfer was an adverse action. OHR further noted that even if appellant made a prima facie case for disparate treatment, DYRS "articulat[ed] a legitimate, nondiscriminatory reason for its action" because YSC was staffed by new hires, not by transfers. It noted appellant's inability to produce evidence identifying correctional officers she claimed had been transferred from Oak Hill to YSC.

OHR found no probable cause for the claim of hostile work environment because appellant had not demonstrated that "the alleged harassment was severe or pervasive enough to affect a term, condition, or privilege of her employment." Describing the incidents as "isolated," OHR questioned whether appellant felt "threaten[ed]" by the incident with Powell and characterized Bryant's sexual comments at the copier machine as "a mere offensive utterance." Nonetheless, even if appellant demonstrated that her treatment was "severe or pervasive" enough to affect her employment, OHR found that "[she] does not prove that [DYRS] knew or should have known of the harassment, but failed to take any action to prevent [it]." Accepting DYRS's account of its responses to the complaints it admitted knowing about (the incidents with Powell and Edwards), OHR concluded that DYRS "took sufficient action."

With respect to the retaliation claim, OHR acknowledged that "[appellant] engaged in protected activity" by complain-

---

**6.** Terry acknowledged during his interview that he has an ongoing complaint against DYRS and that "[he's] been fighting them for 20 years and [is] tired." Terry stated that he is "not a grumpy old man or a disgruntled employee or a trouble maker."

ing about incidents of harassment and that DYRS "subjected her to a materially adverse employment action" by denying her transfer request.[7] OHR also found that appellant established sufficient proof of "a causal connection between the protected activity and the materially adverse employment action." Even though appellant had made a prima facie retaliation case, OHR nonetheless found no probable cause to pursue the claim because DYRS "articulat[ed a legitimate reason" for denying the transfer request. Citing once again to DYRS's undocumented and uninvestigated assertion that YSC is staffed only with new hires and appellant's inability to provide evidence to prove otherwise, OHR concluded that appellant "provide[d] insufficient evidence" that DYRS retaliated against her for complaining of harassment.

Finally, OHR found no probable cause for appellant's claim of constructive discharge because she "fail[ed] to furnish [OHR] with enough evidence" to prove "an aggravated case of hostile work environment." OHR found that the incidents cited were "discrete" and "isolated," and thus did not show that "the alleged harassment was sufficiently continuous as to prompt her resignation."

### F. Request for Reconsideration

Appellant promptly submitted a request for reconsideration, in which she divulged new information. Appellant stated that Bryant had previously told her that her request to transfer would be granted, but that after she complained about his sexual comments to her at the copier, her request was denied. Appellant also named three employees who had been transferred or offered a transfer to YSC: "at least Cas-

sandra Grey, Ms. Joyner and Ms. Taylor." In addition, appellant asserted that in November 2005, she was "abruptly and without reason moved to the nightshift." Appellant stated that she had complained about the change because she could not leave her child alone at night and because the change would cause transportation problems.[8] This change in schedule precipitated appellant's resignation. She noted that "[i]f [she] had not complained ... [she] would have received a transfer...."

On November 19, 2007, OHR denied appellant's request for reconsideration. In its decision, OHR noted that its reconsideration of a determination must be based on "new evidence, misapplication of the law, or misstatement of the facts." OHR concluded that appellant did not satisfy the requirements for reconsideration based on newly discovered evidence because she did not prove that the evidence she proffered with her request "was not reasonably discoverable prior to issuance of the final decision ... because such evidence was either unknown to [appellant] while her claim was pending, or otherwise unobtainable." OHR then reiterated the bases for finding no probable cause for appellant's claims and denied the request for reconsideration.

### G. Proceedings in Superior Court

On September 21, 2010, appellant filed a *pro se* petition for review in the Superior Court. Five months later, for the first time in these proceedings, she was represented by counsel. Relying on *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392 (D.C.1991), counsel argued that the case should be remanded

---

7. This determination is inconsistent with OHR's finding, with respect to the disparate treatment claim, that the denial of appellant's request for a transfer was not an adverse action.

8. In her request for reconsideration, appellant suggested that the supervisors knew of her family responsibilities and her transportation limitations before changing her schedule.

to OHR because the agency: (1) failed to properly investigate appellant's claims; (2) ignored relevant evidence; and (3) failed to address appellant's claim of discrimination based on family responsibilities. Counsel submitted an affidavit in which appellant stated that the OHR investigator interviewed her only once, after she submitted the complaint form. Counsel also submitted an affidavit from Terry, who stated that the investigator had interviewed him for forty-five minutes over the telephone, stopped him when he tried to discuss some of appellant's claims, and did not include the matters he discussed during the interview in her summary report.[9] Terry detailed a pattern of retaliatory behavior taken by supervisors at DYRS against correctional officers who complain about workplace harassment. For the first time, Terry claimed he was present during roll call when Wright made the statement about female officers who complain to EEO. Terry also stated that he knew of a female correctional officer who was transferred to YSC and of other correctional officers who had been retaliated against for complaining about sexual harassment.

On November 9, 2011, the trial court denied appellant's petition for review. The trial court agreed with OHR that it did not need to consider appellant's belat-edly raised claim of discrimination based on family responsibilities. The trial court found that OHR's investigation was sufficient, considering the limited evidence appellant provided on the complaint form. The trial court noted that "[i]nvestigations that obtain no testimony from any supervisors may have their credibility questioned ... However, in this case the OHR made efforts to contact witnesses who could corroborate [appellant's] experience." The trial court declined to consider appellant's claim that her case should be remanded for further investigation under *Simpson*, noting that *Simpson* was distinguishable because appellant failed to timely raise her family responsibilities claim, and that OHR had properly addressed all claims correctly pled.

### III. Standard of Review

■■■ OHR's determination that there is no probable cause to believe that the Human Rights Act has been violated is subject to judicial review. *Simpson*, 597 A.2d at 395. Although this is an appeal from the Superior Court, we must "approach the case as if the appeal arose directly from the administrative agency." *Kennedy v. District of Columbia*, 654 A.2d 847, 853 (D.C.1994). This court reviews the agency's decision "to determine whether there is substantial evidence to support

---

9. According to Terry's affidavit:

On multiple occasions during my telephone call with Ms. Sharpe–Jones, I started to discuss aspects of Ms. Smith's matter and Ms. Sharpe–Jones interrupted me and stated that she didn't want to talk about the subject matter I was discussing. I also told Ms. Sharpe–Jones that she should be asking more questions about the events that Ms. Smith complained about, and suggested several such topics to discuss, but Ms. Sharpe–Jones did not ask those questions or cover those topics.

\* \* \*

On May 2, 2011, I reviewed the report that Ms. Sharpe–Jones wrote from her August 27, 2007 telephone interview with me. The report is only about a page and a half long.... While the interview took place over three years ago, and I therefore cannot now remember the full details of that interview, I do clearly remember that I discussed far more with Ms. Sharpe–Jones than is reflected in her very short page and a half report from that interview. [The affidavit then describes a number of allegations that, according to Terry, were left out of Ms. Sharpe–Jones's report of her interview with him.]

the agency's findings of fact and whether the agency's action was 'arbitrary, capricious, or an abuse of discretion.'" *District of Columbia Office of Human Rights v. District of Columbia Dep't of Corr.,* 40 A.3d 917, 923 (D.C.2012) (quoting *Bagenstose v. District of Columbia Office of Emp. Appeals,* 888 A.2d 1155, 1157 (D.C.2005)). "An agency fails to base its decision on substantial evidence in the record when it ignores material evidence in the record." *See Darden v. District of Columbia Dep't of Emp't Servs.,* 911 A.2d 410, 416 (D.C. 2006). We review the agency's legal conclusions *de novo. Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.,* 683 A.2d 470, 472 (D.C.1996). In doing so, however, we "defer to the agency's interpretation of the statute and regulations it is charged by the legislature to administer, unless its interpretation is unreasonable or is inconsistent with the statutory language or purpose." *District of Columbia Office of Human Rights,* 40 A.3d at 923.

## IV. Analysis

### A. Retaliation: The Roll Call Statement

Appellant argues that OHR's determination of no probable cause cannot be sustained because OHR failed to consider evidence of retaliation that she raised in the complaint form and in her January 17, 2006, letter advising OHR of its omission from the Charge of Discrimination. Specifically, appellant points out that the formal Charge of Discrimination OHR prepared and the Request for Information submitted to DYRS omitted all reference to Wright's statement during roll call warning female correctional officers against making EEO complaints. DYRS hangs its hat on an insufficiency of the evidence argument: that appellant failed to provide the context of the statement. DYRS argues that "[p]erhaps there had

been recent instances of poor performance or other cause of impending terminations ... with the speaker signaling not any impermissible motive but that rather he expected that some female employees would incorrectly make an EEO claim." According to DYRS, "the statement suggests that some employees might be terminated in the future despite having an EEO complaint, not *because* they had an EEO complaint." Moreover, DYRS suggests that the roll call statement was not properly before OHR because it was not included in the formal Charge of Discrimination, which was signed and sworn by appellant.

A threshold question before this court is whether the complaint appellant filled out on the OHR form should be considered part of appellant's charge of discrimination, such that OHR should have addressed any allegations contained in that form even if not included in the version prepared by the OHR investigator, which appellant signed. In *Fed. Express Corp. v. Holowecki,* 552 U.S. 389, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008), the Supreme Court dealt with a similar issue involving a complaint before the Equal Employment Opportunity Commission ("EEOC"). The Court noted that there were three positions on whether claims included in intake paperwork could constitute a charge: (1) intake paperwork cannot be a charge "unless the EEOC acts upon it;" (2) intake paperwork can be included in a charge "if it expresses the filer's intent to activate the EEOC's enforcement processes;" or (3) the intake paperwork is part of the charge. *Id.* at 396, 128 S.Ct. 1147. The Court concluded that "if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402, 128 S.Ct. 1147. Moreover, the Court acknowledged that many of the litigants seeking relief from the EEOC are *pro se*

and that the regulations must be interpreted with them in mind. "The system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." *Id.* at 403, 128 S.Ct. 1147.

With this framework in mind, we turn to the OHR regulations and the intake process followed in this case. The requirements of a complaint to OHR are set forth in the regulations. A complaint is "a notarized statement filed with [OHR], which sets forth a claim of discrimination." 4 DCMR § 799.1 (1986). A complaint alleging discrimination must be "in writing on a form obtained from [OHR]." 4 DCMR § 705.2 (1986). The regulations provide that a complaint to OHR should contain the following information:

(a) The full name and address of the complainant(s);

(b) The full name and address of the respondent(s);

(c) A statement of the alleged unlawful discriminatory practice(s) and a statement of the particulars;

(d) The date(s) of the alleged unlawful discriminatory practice, and if the alleged unlawful discriminatory practice is of a continuing nature, the dates between which the continuing acts of discrimination are alleged to have occurred; and

(e) A statement describing any other action, civil, criminal, or administrative in nature, instituted in any other forum or agency based on the same unlawful discriminatory practice as is alleged in the complaint.

4 DCMR § 705.4 (1986). Notwithstanding these formal requirements, "a complaint shall be deemed sufficient when [OHR] receives from the person making

the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practice complained of." 4 DCMR § 705.5 (1986).

■ Here, the form filled out by appellant was supplied by OHR and was labeled "COMPLAINT FORM." [10] On the form, appellant identified herself and provided her address and a telephone number; gave the address and contact information of DYRS at Oak Hill, where she was employed; and detailed her allegations of discrimination, harassment, and retaliation, including dates, in numerous hand-written pages. Appellant signed and dated the form. There was nothing on the form that would have indicated to appellant (or any other *pro se* claimant) that the allegations she detailed would not be considered as part of her charge of discrimination. We have no difficulty concluding that appellant's hand-written complaint providing additional information in support of her claims of retaliation and hostile working environment is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights . . . ," *Holowecki,* 552 US. at 402, 128 S.Ct. 1147 and that OHR was bound to take that information into account in making its investigation and probable cause determination. *Cf. Park v. Howard University,* 71 F.3d 904, 909 (D.C.Cir.1995) (holding that claim of hostile work environment could not be brought in court under Title VII because complainant had not exhausted administrative remedies as the "EEOC charge contained no claims or factual allegations that could reasonably be expected upon investigation to lead to a hostile work environment claim").

■ In any event, appellant's January 17, 2006, complaint to the investigator

---

**10.** The first page of the form states: "This form is subject to review and acceptance by [OHR]."

should have led to an amendment of the Charge of Discrimination. The regulations provided that "[a] complaint may be amended by the complainant or the Director at any time prior to a hearing." [11] 4 DCMR § 706.1 (1986). Appellant's letter implicitly sought to amend her complaint by informing OHR: "I discovered some pertinent information that was omitted, from my complaint." There is no indication in the record that the investigator subsequently amended the charge (as the regulations then permitted) or instructed appellant on the proper way to amend her charge. There is also no indication that the investigator ever responded to the letter, or informed DYRS of the omission. DYRS's response was not filed until March 2, which provided ample time for the investigator to notify the agency of appellant's complaint in full.

■ DYRS argues that the omission of this part of appellant's complaint is not material because OHR had a substantial basis to find no probable cause to support appellant's retaliation claim, as appellant provided insufficient evidence to demonstrate that DYRS's asserted non-retaliatory reason for denying the transfer request—that no correctional officers had been transferred from Oak Hill to the YSC facility, which was staffed with new hires—was a pretext. That is not a satisfactory answer because, as we discuss below, appellant's burden at this preliminary stage of the proceeding was not to prove

that DYRS's explanation was pretextual, but to present a "reasonable" claim that the denial of her transfer request was retaliatory. Moreover, appellant's claim of retaliation was also supported by the related claim that a person in a supervisory position made a statement during roll call that appellant took as a warning directed to her for having made an EEO complaint. With respect to the latter claim, we note that it is "an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected under [the D.C. Human Rights Act]." D.C.Code § 2–1402.61(a). A party seeking to prove a claim of retaliation "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted). The D.C. Circuit has acknowledged that "[a] threatening verbal statement, standing alone, might well constitute a materially adverse action." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C.2010). The court also cautioned that "'[c]ontext matters' and that 'the significance of any given act of retaliation will often depend upon the particular circumstances.'" *Id.* (quoting *Burlington*, 548 U.S. at 69, 126 S.Ct. 2405).[12]

11. Currently, 4 DCMR § 706 (amended in 2009) provides that only a complainant can amend the complaint.

12. In *Gaujacq*, a supervisor told the appellant, "[Y]our career is dead in [the company] if you file the claim." 601 F.3d at 577. The D.C. Circuit posed the relevant inquiry as whether "[a]n employer's words and other actions . . . considered in context . . . would 'dissuade a reasonable worker' from filing a claim and thus result in actionable retalia-

tion." *Id.* at 578 (quoting *Burlington*, 548 U.S. at 57, 126 S.Ct. 2405). The court concluded that a reasonable worker "would not have taken [the supervisor's] brief, fleeting, and unadorned verbal statement as an act or threat of retaliation." *Id.* The court then cited numerous instances where the claimant's needs had been accommodated by her supervisors. Noting that the statement was made during a contentious time, the court concluded that the statement "appears less a threat than an expression of exasperation over [the

The omission of the allegation concerning Wright's statement during roll call was potentially material on the issue of retaliation. Wright was at the time Acting Deputy Superintendent for Oak Hill Youth Center, where appellant was employed as a correctional officer. That is, itself, highly significant. Wright's statement, standing alone, could be interpreted as a general warning from top management to female correctional officers not to file EEO complaints. We cannot evaluate, however, Wright's alleged statement during roll call because it was not incorporated, as it should have been, in the Charge of Discrimination; as a result, DYRS did not respond to this allegation or provide relevant information, and it was not considered by OHR in its Letter of Determination.[13] It is possible—as the government argues on appeal—that viewed in context, the statement, even if inartfully phrased, was not intended as a threat of adverse action directed at female employees who make EEO complaints. However, based on the evidence of record, that appellant had complained of harassment and her personal interpretation that Wright's comment was directed at her, it could very well be considered a form of retaliation.[14] At this juncture, because OHR has not acknowledged or made findings with respect to a potentially material allegation in appellant's complaint, its determination that there is no probable cause to sustain a charge of retaliation is not based on substantial evidence. *See Darden*, 911 A.2d at 416. Moreover, this is a factual matter that has to be properly investigated, particularly in light of Ter-

ry's allegations concerning a "pattern" of retaliatory behavior at DYRS. The agency must have an opportunity to respond to appellant's allegation, and appellant, in turn, the opportunity to rebut DYRS's response with argument and, if appropriate, additional evidence. OHR must then make a finding as to whether the statement attributed to Wright was made and, if so, whether it was "materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68, 126 S.Ct. 2405 (internal quotation marks omitted). These findings are also relevant to the question whether DYRS's non-retaliatory reason for denying appellant's transfer was pretextual and the "real reason" for denying the transfer request was discriminatory. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### B. Witness Intimidation: Statements of Employees hand Other Evidence of Record

▮ Also missing from OHR's Letter of Determination was any mention of two of appellant's co-workers who lent support to appellant's claims of harassment and coercion: Terry's statements to the investigator and Raper's refusal to be interviewed by the investigator. Terry made several comments that were relevant to DYRS's response (and OHR's determination) that appellant's complaint was not substantiated. He told the investigator that "[e]verybody knew she was being harassed" but that "[p]eople were told not to help her."

---

appellant's] ongoing antics" and that "[n]o reasonable employee who received as much accommodation as did [the appellant] could construe [the supervisor's] statement as an unlawful retaliatory threat." *Id.*

**13.** *Gaujacq*, on the other hand, was decided on undisputed facts at the summary judgment

stage, after the parties have had an opportunity to conduct discovery. 601 F.3d at 569.

**14.** On the complaint form, appellant stated that she felt that Wright's comment was directed at her because she had already requested a transfer.

Terry repeatedly stated that supervisors instructed employees not to provide statements in support of appellant. The day after the Terry interview, the investigator contacted Raper, who had been identified by appellant as a "harasser" on the intake form and as a witness by DYRS, for an interview, "but he declined to cooperate." These two employees were the only witnesses who were contacted by the investigator.

"Our principal function 'in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues.'" *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C.2007) (quoting *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972)). "If the agency fails to make a finding on a material, contested issue of fact, this court cannot fill the gap by making its own determination from the record, but must remand the case for findings on that issue." *Morris v. United States Envtl. Prot. Agency*, 975 A.2d 176, 181 (D.C.2009) (internal quotation marks omitted). On appeal, DYRS calls Terry's statements "vague claims of coercion" and relies on appellant's failure to name more witnesses to the alleged harassment. However, we cannot conclude that Terry's statements were "vague" or uncorroborated. On their face, Terry's statements and Raper's refusal to be interviewed corroborate appellant's earlier comment that

Oak Hill employees were afraid for their jobs and would be unwilling to come forward in support of her complaint. They raised a red flag about potentially coercive behavior by DYRS supervisors. This was critical to whether appellant could have offered more substantiation for her claims of discrimination, retaliation, and constructive discharge. At the very least, OHR should have expressly addressed Terry's statement, and Raper's subsequent refusal to cooperate, in its Letter of Determination. Moreover, there is no indication in the record that OHR conducted an investigation about the alleged coercive comments or made findings as to whether they are themselves actionable as interference with an investigation.[15]

We have further reason to doubt that OHR considered "all material facts and issues." *Georgetown Univ. Hosp.*, 916 A.2d at 151. As appellant notes in her brief, OHR's Letter of Determination concluding that there was no probable cause to believe appellant had suffered harassment, retaliation, or constructive discharge stated that it based its findings of fact on four documents: "1) Complainant's sworn complaint; 2) Respondent's statement of position, and supporting exhibits (i.e., affidavits); 3) Complainant's rebuttal to Respondent's statement of position; and 4) Respondent's Policy applicable to Complainant's allegations." OHR apparently did not consider several documents that appellant notes are part of the administra-

---

**15.** The D.C. Human Rights Act provides, and DYRS concedes, that interfering with an investigation is a discriminatory action:

(b) It shall be an unlawful discriminatory practice for any person to require, request, or suggest that a person retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter, or because that person has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter.

(c) It shall be an unlawful discriminatory practice for any person to cause or coerce, or attempt to cause or coerce, directly or indirectly, any person to prevent any person from complying with the provisions of this chapter.

D.C.Code § 2–1402.61.

tive record and of the record on appeal, including:

(1) the multiple documents and written statements which Ms. Smith submitted to OHR as a part of her pre-complaint intake interview on December 29, 2005; (2)(2) Ms. Smith's January 17, 2006 letter to the OHR investigator, in which she pointed out that critical facts which she had raised in her pre-complaint intake interview and accompanying documents had been omitted from the complaint form which OHR prepared for her, such as the roll call statement made by her Acting Deputy Superintendent Mr. Wright, in which he said "This is for the females: You can go to EEO, some of you all will not be working here next week, month, or next year,;" (3) Ms. Smith's letter to the OHR investigator of August 13, 2007, two days after Ms. Smith submitted her rebuttal to DYRS' position, and the 23 accompanying documents submitted with that letter; (4) the report of the OHR investigator's interview with Correctional officer Mr. Terry on August 27, 2007, in which Mr. Terry stated that DYRS management had instructed its employees not to cooperate with OHR's investigation of Ms. Smith's matter; and (5) the OHR investigator's report of her attempted interview of Correctional Officer William Raper on August 28, 2007, which indicated that Mr. Raper "declined to cooperate" with the investigation.

These apparent gaps in OHR's consideration of the evidence and failure to address specific claims leave us with no option but to remand the case for full consideration of appellant's claims by the agency under the appropriate probable cause standard.

## C. Hostile Work Environment: Racial Insults and Denigrating Treatment

Appellant alleged in her complaint that she was exposed to sexual harassment by her supervisor and subjected to racial name-calling ("such as Nigger Bitch") and other demeaning treatment by co-workers. DYRS denied in its position statement that appellant ever reported such conduct, except for two incidents (with Powell, who allegedly groped her breast in the closet, and Edwards, who retrieved a gun in the parking lot). In its Letter of Determination, OHR appears to have accepted, without explanation, DYRS's claim that it was unaware of the harassment (even though appellant claimed she had brought it to the attention of her supervisors); OHR did not mention the racial name-calling and demeaning treatment in appellant's complaint. Nor did the OHR investigator interview four of the five persons that appellant identified by name as those who harassed her by "call[ing] her names," [16] the two identified supervisors ("Mr. Bryant and Mr. Johnson") to whom she complained but who (according to appellant) did "nothing;" or the person ("Mr. Belton") appellant identified as someone who had witnessed the harassment.

▬ A claim of hostile work environment requires a showing: "(1) that [the employee] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C.1998). In addition, we have held, "in order to be actionable under the statute, a sexually ob-

---

**16.** Appellant identified "Mr. Raper, James Edwards, Mr. Dunn, Mr. Taylor, [and] Mr. McQueen."

jectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Campbell–Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 933 (D.C.2012) (internal quotation marks omitted). OHR concluded that appellant's complaint with respect to the incidents with Powell and Wright met the first three elements of a sexually charged hostile work environment claim, but that there was no probable cause to support the claim because appellant did not show that the harassment was "severe and pervasive enough to affect a term, condition, or privilege of employment," *Daka*, 711 A.2d at 92. OHR concluded that, in any event, DYRS took "sufficient action" with respect to the complaints that had been brought to its attention.[17]

■ OHR's determination is flawed in several respects. First, it did not address all the allegations of harassment in appellant's complaint, specifically, the racial name-calling. Second, although we have said that "[m]ore than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case," *Howard Univ. v. Best*, 484 A.2d 958, 980 (D.C.1984), a single insult may be "severe enough, in and of itself, to create a hostile work environment." *Reid v. O'Leary*, 1996 WL 411494, at *4 (D.D.C. July 15, 1996) (holding that whether being called "Coon–Ass" can satisfy a hostile work environment claim is a question to be decided by the jury). "As other courts have observed, 'perhaps no single act can more quickly alter the conditions of employment' than 'the use of an unambiguously racial epithet such as 'nigger' by a supervisor.'" *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C.Cir.

2013) (footnote omitted) (quoting *Rodgers v. Western–Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir.1993)). We decline to consider whether appellant's allegations of racial name-calling in this case rise to that level without any determination on the relevant facts by OHR. *See Morris*, 975 A.2d at 181. They must be addressed on remand.

## V. Remand

■ We have already mentioned several items that must be considered on remand. We also note that, although the Letter of Determination initially stated that "in order for Complainant to prevail the OHR's record must contain credible, probative and substantial evidence from which a reasonable person could conclude that Complaint met the *prima facie* elements" of her claim, at several points in the letter, OHR's determination of no probable cause is explained by reference to appellant not having "prove[n]" some element of her claim. This latter formulation is misplaced as it confuses the probable cause standard at the threshold of a proceeding, *see Sparrow v. District of Columbia Office of Human Rights*, 74 A.3d 698, 706–07 (D.C.2013), with the higher standard of proof by a preponderance of the evidence that applies at a full-fledged administrative adjudication of the charge of discrimination. *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C. 1993). Moreover, applying the probable cause standard "requires consideration of whether [the complainant's] version of events was reasonable, not whether [he or she] failed to disprove [employer's] version of events." *Sparrow*, 74 A.3d at 706. Thus, on remand, OHR must consider all the evidence and allegations to determine whether appellant's claims were "reason-

---

**17.** However, as DYRS denied knowledge of Wright's sexually suggestive comment, it could not have taken any action. OHR dismissed it as "a mere offensive utterance" that was not "physically threatening."

able" and make out a prima facie case under the Human Rights Act. If so, there is probable cause to take the next step in the process. It is at a full hearing, where OHR is able to take the measure of witnesses and other evidence, that appellant has the burden to prove her claims by a preponderance of the evidence.

Appellant argued before the Superior Court and to this court that OHR failed to properly conduct an investigation of her claims. OHR is vested with considerable discretion in how it conducts its investigations and has a panoply of tools at its disposal to do so. An OHR investigation can take the form of "field visits, written or oral inquiry, conference, or any other method or combination of methods suitable in the discretion of the Director or staff personnel assigned responsibility for the investigation, subject to the appropriate guidelines." 4 DCMR § 710.2 (1986). The investigator may require the complainant to provide:

(a) [a] statement of each specific harm that the person has suffered and the date on which each harm occurred;

(b) [f]or each harm, a statement specifying the act, policy, or practice which is alleged to be unlawful; and

(c) [f]or each act, policy, or practice alleged to have harmed the person claiming to be aggrieved, a statement of the facts which led the person claiming to be aggrieved to believe that the act, policy, or practice is discriminatory.

4 DCMR § 710.3 (1986). OHR also has authority to issue subpoenas to compel "[t]he attendance and testimony of witnesses." 4 DCMR § 720.1(a) (1986).

In light of our remand, we do not need to decide, at this juncture, whether OHR properly exercised its discretion in the investigation of appellant's complaint. We have noted, however, instances where OHR's investigation appears to have been lacking in light of the nature of the allegations and information available to the investigator from appellant's intake complaint. For example, where the complaint alerted OHR to the possibility of, at least, reluctance on the part of possible witnesses and a witness (Terry) said the employees were cowed by management, OHR could have issued a subpoena to Raper (rather than simply accepting his refusal to cooperate) and to other employees. If the employee still refused to speak to the investigator, OHR could have "undertak[en] appropriate action to compel compliance with the subpoena." 4 DCMR § 720.5 (1986). Although OHR has the power to issue subpoenas and compel testimony, it was not used in this case.

## VI. Conclusion

 For the foregoing reasons, we reverse the decision of the Superior Court and remand the case to OHR for further proceedings, including further investigation of appellant's claims, consistent with this opinion.[18]

*So ordered.*

---

18. Appellant argues that OHR erred by declining to consider evidence related to her family responsibilities claim. She argues that, even though she did not properly identify that claim on the complaint form, she should be shown some leniency since she was *pro se* during the proceedings before OHR. We disagree. Appellant did not indicate in any manner that a basis for her complaint was family responsibilities. She attributed her resignation to her request for "a transfer due to the harassment and lack of transportation which was denied." She did not raise a family responsibility claim until her request for reconsideration. While appellant may have had a viable family responsibilities claim, she should have raised it before OHR issued its Letter of Determination, not after.

Although we do not fault OHR for refusing to consider that claim in the motion for reconsideration, we also do not preclude OHR from considering it on remand if it deems appropriate and the parties are given adequate opportunity to address it.